And we turn to the third case on our day calendar, which is In Re. Bernard Madoff Investment Securities, LLC. We'll hear from Mr. Kirby. Thank you, Your Honor. May it please the Court. Section 548 of the Bankruptcy Code dictates the outcome of this case. We rely exclusively on the Bankruptcy Code in this fraudulent transfer action because SIPA Section 8C3 requires it. Section 548 defines what is and what is not a fraudulent transfer. This statute codifies more than 400 years of fraudulent transfer law. 548 tells us that the defendant's transactions were not fraudulent transfers. Why? Because the defendants made good faith withdrawals from their brokerage accounts and the withdrawals satisfied a debt. Subsection C of 548 states that a recipient of a transfer made in good faith and for value is entitled to retain any interest transferred, even if the transfer was made by the debtor with an intent to defraud. The trustee concedes good faith, and we know from the statute that the withdrawals were for value because subsection D of 548 contains its own definition of value, which includes satisfaction of a debt. The defendants are therefore entitled to keep what they received. We know that each withdrawal satisfied a debt because of this court's conclusions about the very same accounts and transactions of these same defendants in the Fishman case. The trustee's intentional fraud action was not before the court when these same appellants appeared before you in Fishman. We are before you today on that cause of action, and because these appeals relate to the same transactions, the court's conclusions in Fishman that the defendants had enforceable contract rights become the starting point of these appeals. In Fishman, this court ruled that Madoff had an obligation to make payments to the defendants because the account documents themselves obligated Madoff to make payments on a request for withdrawal. And each monthly statement created a new enforceable contract right from their account agreements. The trustee argues that Madoff's fraud somehow limits enforcement of the defendants' contract rights. It does not. This court rejected that argument in Fishman, recognizing that the appellants had those contract rights, even if Madoff secretly intended to defraud his customers, and even if Madoff stole the money from another client. Those contract rights were obligations, and the broker's payments of those obligations satisfied the debt. Under the statute, since the payment satisfied the debt, the defendants are entitled to keep their withdrawals. The trustee in response talks about Ponzi schemes, fictitious profits, and says that this court should look to SIPA instead of the bankruptcy court. The trustee's arguments do not withstand scrutiny. Contrary to what the trustee argues, the type of fraud is not relevant in analyzing a fraudulent transfer action. And the Ponzi scheme cases he cites do not apply to these transactions. Not one of those cases dealt with a special relationship between a broker and a customer, a relationship specifically protected by the federal securities laws. Moreover, here the party stipulated that Madoff was also an investment advisor, meaning he had a fiduciary obligation to the defendants. Not one of the Ponzi scheme cases dealt with a relationship between a debtor that had a fiduciary obligation to its creditors. The broker-dealer-customer relationship is protected by the 1934 Act. The protection, in fact, is one of the mandates of the Act. The statute uses the term customer protection over 200 times, and SIPA is part of the 1934 Act. Not to give effect to the broker-customer relationship would be totally contrary to the 1934 Act. What about the customers that were defrauded and got no money out? Aren't they also protected? They are, but they're protected by a different statute. That's SIPA. They are permitted to file a net equity claim, and that is not an issue before the court. An equity claim isn't an equity when we're talking about equity in bankruptcy. Why isn't the SIPA regime, where you have this customer account, part of that equity? Court after court, not in the Second Circuit, but court after court has upheld as appropriate. It's sort of like a separate regime, equitable regime, within the bankruptcy, within the larger bankruptcy context. It's sort of a separate situation that deals with a particular case of this sort. Well, Your Honor, the fundamental answer to that is that SIPA looks to the bankruptcy code to recover property that was transferred before the petition. These were all transfers that occurred long before there even was a SIPA estate. What the court has said, what the statute says, is that in order for a trustee to bring that money back into the estate, what the trustee needs to do is to bring a claim under the bankruptcy code, applying ordinary bankruptcy principles, and bring that money back. Only if it's successful, then does it become part of the SIPA estate to be distributed in accordance with the rules of SIPA. But this is a bankruptcy case. This is a bankruptcy code provision, and what SIPA does not say is ignore the principles of bankruptcy. And Your Honor, on that point, I would just emphasize that the court's decision in the Fairfield Greenwich case said exactly that. It recognized that until a trustee avoids and recovers pre-petition transfers under the bankruptcy code, the proceeds of those transfers do not become property of the debtor, and until the proceeds become property of the debtor, they do not become part of the SIPA estate. So let me turn to fictitious profits. The trustee also argues that the defendants are trying to keep what he has dubbed fictitious profits. That term is a red herring. This court already stated in the Fishman portion of this case that the defendant's contractual payment rights exist notwithstanding Madoff's fraud. The concept that their account withdrawals are somehow fictitious has no basis in law. The bankruptcy code looks at each transaction, and if the transaction meets the 548C test, the recipient keeps the proceeds. So if the defendant received their account withdrawals in good faith, consistent with their brokerage statement, it is not a fraudulent transfer. This makes sense. You have an account, you take money out in good faith, relying on your statement, and years later, out of the blue, you get sued. Why would the law penalize an innocent customer who got what was due? It does not. And that is why Section 540 is written the way it is, and codifies centuries of fraudulent transfer law. Excuse me, but did you say that your client got what they were due? That's exactly right. They were due the money that the other people were putting in? It's a Ponzi scheme. Your Honor, in the Fishman case, the court recognized that the obligations that the debtor had, the debts that the debtor had, were enforceable, notwithstanding the fraud. And on that point, this court specifically says, and notwithstanding the fraud, that even if the property was stolen from other clients, that was an enforceable right. And that is why we go back, that was the Fishman, we focus on the Fishman case, because the court dealt exactly with that issue, and said, those are enforceable obligations. And so what we have here, in the next phase of this same case, is the defendants invoking their rights to those obligations, which they received years before there ever was a SIPA case. SIPA doesn't change, go back and restate what happened before the SIPA case, SIPA deals with what happens once there is a liquidation, and that's fundamentally the difference. The Fishman case did not treat the account statements as account documents that created an obligation, specifically. It was talking about the contract, I believe, between the customer and BLMIS. Well, that's what the contracts our clients are seeking to enforce, your honor. That's exactly the contract we're seeking to enforce. And those were the contracts that were at issue. I thought you were saying that the account statements, or if the account statements are not relevant to your argument, then I understand that. Well, your honor, they're together. The court said two things in Fishman. It said that the account documents themselves were enforceable contracts. And the court said also that the written crediting under New York UCC law, the written crediting of securities to an account was an enforceable securities entitlement under New York law. The court has expressed on that. And that's where the court says that's true, even if what Madoff did was to steal money from other clients. And that's at Fishman page 422. And so it is expressly dealt with that issue under these circumstances. So all we are saying is that the determination by Fishman as to the property rights and contract rights of these defendants, which is independent of the outcome of the particular facts of Fishman, control here because it's the same case involving the same transactions in the same parties. Fishman was under 548A1B and the safe harbor. We're now dealing with 548A1A, which doesn't have the safe harbor. Does that matter? No. And the reason is this. The court, in analyzing the property rights of the parties, looked at the underlying contract relationship between the parties. And having reached that conclusion, it then went on to apply how it fit within the safe harbor exemption or it didn't. Those property rights don't change just because Madoff deliberately defrauded people. The property rights are what they are. In fact, in two cases this term, the Supreme Court reiterated that the property rights of the parties that existed pre-petition always apply post-petition. They define the property rights of the parties. That's why we look to how the court explained it in Fishman as to the property rights of the parties and how, therefore, those property rights apply at the time. And remember that the fraudulent transfer statute measures the validity of the transaction at the time of the transfer. And that's what we're looking at. Okay. Any other questions? Okay. Hearing none, how much time did Mr. Kirby reserve? Three minutes. So we'll hear from Ms. Brown. Yes. May it please the court, Shawna Brown on behalf of Irving Picard, trustee. This appeal really boils down to two questions. The first one is, can appellants give value for transfers of fictitious profits? And the answer to this question under any relevant law, SIPA, the Bankruptcy Code, and Ponzi scheme case law, the answer is no. The second question presented by this appeal is whether the trustee correctly calculated the amount that are owing from the appellant and properly sought only those amounts within the two-year period. And the answer to that question is yes. I'm going to address each of those questions in turn, and then last, I'm going to discuss why this court's Fishman case doesn't change any of that law. So looking at the value question. All three judges will love to consider this question. District Judges Rakoff and Engelmeyer and Bankruptcy Judge Bernstein have recognized that every single circuit court to consider this issue has concluded that an investor's profits from a Ponzi scheme are not for value under the Bankruptcy Code. And this court recognized in a recent opinion, Silverman v. Cullen, that the prevailing view in this district and bankruptcy courts of this circuit is the same. Investors don't give value for their Ponzi profits. So the appellants lose under the Bankruptcy Code, which is the regime that they're arguing applies here. But their argument ignores SIPA. SIPA clearly applies here. Their argument is based on the fact that they get special protections because they're brokerage customers. And what is that special protection given to brokerage customers? It is SIPA. SIPA is Congress's determination that the best way to protect brokerage customers is to make sure that the property customers give to their broker doesn't go to pay any other type of creditors in a liquidation proceeding. It only goes to pay customers, and it only goes to pay net equity claims. So let's turn to the claims that appellants say provide value for transfers. They say they have claims under state law, under the UCC, and under federal securities law. They have tort and fraud claims. But these are the same claims that every single BLMIS customer has because Mr. Madoff stole their money and he never bought the securities he said he was going to. These appellants stand shoulder to shoulder with all of Madoff's victims. And SIPA is very clear that anything other than a net equity claim is a general estate claim, and those types of claims cannot be paid until the net equity claims are paid first. So by allowing the appellants to assert value for these claims, they would essentially be getting paid out on a general estate claim before net equity claims have been paid, and they would be getting a general estate claim paid before anyone else, even though all BLMIS customers suffered the same harm. Judge Rakoff said it well below, at Special Appendix 85, which is if you allow appellants who have no net equity claims to retain profits of customer property on the grounds that their withdrawal satisfied claims under state law, then you're basically abolishing the priority scheme under SIPA for dealing with these net equity and general creditor claims. I want to turn quickly to the calculation issue. The appellants have said that there's a problem with the way that the trustee has calculated claims because he looks at the life-to-date history of the account. Well, this circuit and its net equity decision in 2011 told the trustee how to reconcile claims, and they said for each BLMIS account, you look at the cash-in, cash-out from the start date. So that's what the trustee did. And then what the trustee does is he sues for the people who have taken out more than they put in, he sues for the transfers that occurred within the two-year period. So that's all within the bankruptcy code. It's consistent with that law that's set forth there. I want to turn to page 51 of the appellant's brief to show you why the trustee's methodology implementing the circuit's prior ruling is the correct one and that their proposal is not workable. So on page 51, if you turn to their brief, they have what they sort of call a reset to transactions that occurred within the two-year period before the bankruptcy. But if you look at the very far left column of their brief, their starting point is the November 2006 statement. And if you add all that up, that gives them a starting point of $74 million, which includes years and years of fictitious gains. That's basically taking exactly what's on the statement and giving them credit for that. Well, this court has already said that that's not permissible. No customer gets the benefit within those statements because it was fake. So if you ignore that left-hand column and you only look at the deposits and withdrawals within the two-year period and you net those amounts, these appellants would end up owing the trustee twice as much as they do now. Right now, they owe the trustee $41 million. But if you only netted the deposits and withdrawals within the two-year period, they would end up owing us over $80 million. And why is that? It's because they don't get the credit for the deposits that occurred before that time period. And so to deviate from this circuit's methodology in calculating either net equity claims or the amounts that are owed to the estate would lead to arbitrary and unfair results, even for these appellants. My last point is I want to talk about why Fishman doesn't change anything, this court's decision. And I have three reasons. The first is the statute itself. 536E has an explicit carve-out for claims under 548A1A. It had certain goals when it passed 536E, and those goals have been accomplished in this proceeding. The court found that it applied here and barred certain transactions and allowed these ones to go forward. The second reason is this court's 536E opinion itself. This court, in that opinion, never said that the transfer of fictitious profits were for value. They never said that the contracts were enforceable outside of the realm of 546E. They never relied upon the monthly customer statements that listed the securities position. So that opinion did not convert a diversion of customer property into a valid payment in satisfaction of an antecedent debt. What the court found is that the account-opening documents were securities contracts and the transfers were settlement payments within the meaning of 546E. They also found that the transfers were made in connection with a Ponzi scheme and, as a result, were fraudulent. So the fact that this court applied 546E doesn't answer the question about whether the transfer is for value under 548C. My third and final point is if we look at the obligations that the appellants are claiming give rise to value, let me tell you why they don't. The obligations don't come from the account-opening documents. The only place that the securities positions that they're saying give rise to the obligations are listed are on the monthly account statements. And the appellants stipulated here that those securities positions never existed. That's the record before this court. And for that reason, Judge Rakoff-Below found that the account statements were invalid and unenforceable. He said, quote, in this context, the transfers must be assessed in what they really were, and they really were artificial transfers designed to further the fraud rather than any true return on investment. So I think that answers the question about whether or not those were enforceable. But even if the obligations were valid, even if appellants are completely right, at most they are general estate claims. And SIPA says you can't pay those claims until all net equity claims have been paid. Your Honors, the cases that defendants rely upon do not involve Ponzi schemes, and they don't involve SIPA liquidation. They don't provide any assistance here where there's two different statutes at issue and a large body of case law that tells us how to deal with the aftermath of a failed brokerage firm that engaged in a Ponzi scheme. I would ask that this court, like every other circuit court to consider the question, rule that transfers of fictitious profits are not for value. That is the only ruling consistent with SIPA and the Bankruptcy Code, and the only ruling that will uphold the purposes of those statutes, which is customer protection and equal treatment of creditors in the bankruptcy. If Your Honors have any questions, I'd be happy to answer them. Thank you. Judge Walker? No, no, nothing. Judge Sack? Yeah, you were going to, and perhaps you didn't, and the sound waves passed me by, but you were going to mention the Ida Fishman case and specifically how that applies, which was in the context of subsection B, how that applies to the case of Barr. If you want me to answer that, I'll go back and look at the transcript. I did answer that, Your Honor, but I could give you a brief summary, which is I think that the fact that the court applied 546E in this case doesn't answer the question about whether or not these transfers are for value. The court did recognize that there were valid securities contracts and there were valid settlement payments, but they never found that there were enforceable statutes. And that, I take it, is something that goes really to the question of safe harbor, which is applicable to B and not A. That is to say that's what the safe harbor is for, as I recall. That's correct, Your Honor. Congress exempted certain transactions from a trustee's reach, but the claims before this court today are not those claims. These claims were explicitly permitted to go forward. In other words, in B, it says for value, there's a safe harbor provision that covers a transfer made in connection with a securities contract, and that's certainly true here. But that transfer made in connection with a securities contract does not map onto the in good faith under subsection A. Something like that? Yeah, I think the way I think about it is that if the appellants are correct, that the existence of a securities contract gives rise to value, then essentially 546E is a safe harbor for all transactions between a broker and its customers. The exception would follow the rule. So I don't think it's covered by 548A1A. Thank you. Well, that's very good. And are we hearing from Mr. Kelly? Yes. Good afternoon. May it please the court. Nathaniel Kelly for the Securities Investor Protection Corporation. This court has held previously that because Madoff Securities operated as a Ponzi scheme, its customers' net equity claims under SIPA should be calculated as deposits minus withdrawals. Customers are only entitled to the return of their principal. This same calculation is applied in measuring the value defense to avoid transactions in Ponzi scheme cases. A transferee in a Ponzi scheme can only provide value up to the return of its principal. It cannot provide value for the receipt of fictitious profits. The defendants argue that to apply this rule to brokerage customers in the Madoff Ponzi scheme would be inconsistent with the bankruptcy code and this court's decision in Fishman. It is not. Fishman said that defendants have securities contracts, but one must still ask the value provided by the transfers under those contracts. First, courts, both under the bankruptcy code and state fraudulent transfer laws, consistently hold that a transferee cannot provide value for fictitious profits. Contrary to the defendants' arguments, this is true even for claims to contractual profits, such as in this court's decision in Silverman v. Cullen and in the Fifth Circuit's decision in Jane v. Brown. Second, this rule is consistent with SIPA, which prioritizes customer claims and provides for the pro-rata distribution of property to customers over general creditors. To allow a defendant to retain fictitious profits allows it to prioritize its non-customer claims for fictitious profits over customer claims. This would violate SIPA and the protections it provides. Third, it's consistent with the customer protection rule under SEC regulations. As defendants acknowledge in their reply brief, customer property exists before the liquidation as segregated property under the customer protection rule, and after liquidation as SIPA's fund of customer property. Defendants further acknowledge that only customers have a claim to customer property. It can't be used for any other types of claims or business expenses. So before and after the commencement of a SIPA liquidation, customer property cannot be used to pay other debts or claims against the debtor. In their reply, their defendants argue, however, that they are entitled to withdrawals from customer property because they can withdraw fully paid-for securities. This argument is wrong. As defendants stipulated, no securities were purchased for their account. Fully paid-for securities is a defined term under SEC regulations, and it should come as no surprise that the securities on the defendant's account statements do not meet that definition. Fourth, this rule is consistent with state securities laws. To the extent that defendants' account statements created security entitlements, the UCC specifically states that an entitlement holder's property interest to financial assets held by a brokerage firm is a pro rata interest shared with other entitlement holders. In the case of the Madoff Ponzi scheme, their pro rata interest in the assets held by Madoff securities is only their principal, since no securities were purchased and no profits were made. Finally, it's consistent with the law on claims under the securities laws. In a Ponzi scheme, these claims cannot be based upon the fictitious account statements made up by Madoff. Courts, including this one, have refused to calculate damages based upon the fictitious profits that a Madoff customer could have withdrawn from other investors' stolen funds. At this time, I would ask if the court has any questions. Judge Walker? No, I'm all set. Great. And Judge Sack? No, thank you. And so we turn to Mr. Kirby, who has reserved some time. Three minutes. Thank you, Your Honors. Four points that I would like to raise with you in response. First, the fraudulent transfer statute has a specific definition of value, which is payment of a debt, satisfaction of a debt. That is in Section D-2 of the statute, and neither the trustee nor SIPC confronts that that's what the statutory definition is. It's a satisfaction of a debt. And going back to what I said earlier about the Fishman case, those were obligations that existed before the petition, before there ever was a SIPC estate. So this gets me to the second point. You heard SIPC argue today about the term customer property. The customer property is a specifically defined definition in SIPC itself. It does not have operation before there was a liquidation case. In fact, the definition of customer property is property held by the debtor at the time of the filing. And so that is why this court in its Fairfield Greenwich case recognized that you must use the bankruptcy code and those provisions in analyzing how to approach a fraudulent transfer case. You do not look to SIPA. SIPA has no relevance to the bankruptcy claim. And what we are saying is that the statute itself defines what is value. It is not by reference of SIPA. SIPA doesn't come into play. I would like to comment about the discussion of the Silverman case. The Silverman case was a constructive fraudulent transfer case and involved debt payments, which the court, which are totally different from the kind of situation that we have here, which are payments to a customer of a broker. We are not seeking general damages. We're not seeking tort claims. We are seeking to enforce our contract claims. And the 34 Act itself clarifies in Section 29B that a customer of a broker in a securities contract is entitled to enforce that contract, notwithstanding any fraud by the maker. That is statutory provision, is part of the substantive law that existed at the time before there ever was a SIPA liquidation. And that is why that applies. That controls how these contractual claims must be read. Your Honor, one final point. The preference. What the trustees, they say, is essentially not fair. To have customers who did not get paid in the later SIPA liquidation, who lost money. And the trustee is asking for a remedy to equalize losses among customers. But that is the type of remedy is a preference remedy under Section 547, not a fraudulent transfer remedy under 548. And here in this case, the trustees preference claims were already dismissed by virtue of the Fishman case, which was barred by 546E. This is not this court in its sharp opinion and other and the Boston trading opinion by Justice Breyer when he was on the First Circuit recognized that fraudulent transfer statutes are not a preference statute. And therefore, equalizing payments is not the purpose of the fraudulent transfer loss. As long as a creditor gets paid, that is sufficient. As long as they're acting in good faith, that is sufficient under the fraudulent transfer statutes. Hey, that's it. Thank you very much. Thank you, Your Honors. Thank you. Thank you very much for.